556 F.2d 167
 14 Fair Empl.Prac.Cas. 1210, 14 Empl. Prac.
Dec. P 7506
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION et al.
v.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY et al.,
Communications Workers of America AFL-CIO (CWA) (Intervening
Defendants),
Telephone Coordinating Council, TCC-1 (national Bell
Council) et al., intervening defendants.
Appeal of COMMUNICATIONS WORKERS OF AMERICA, in No. 76-2217.
Appeal of the TELEPHONE COORDINATING COUNCIL, TCC-1, IBEW,
in No. 76-2281.
Appeal of ALLIANCE OF INDEPENDENT TELEPHONE UNIONS, in No. 76-2285.
 Nos. 76-2217, 76-2281 and 76-2285.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 14, 1977.
Decided April 22, 1977.
 
 William J. Kilberg, Sol. of Labor, Carin Ann Clauss, Associate Sol. of Labor, Dept. of Labor, J. Stanley Pottinger, Asst. Atty. Gen., David L. Rose, James S. Angus, Attys., Dept. of Justice, Washington, D. C., Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, Beatrice Rosenberg, Asst. Gen. Counsel, James P. Scanlan, Atty., E. E. O. C., Washington, D. C., for appellees.
 Thompson Powers, Jane McGrew, Morgan D. Hodgson, Steptoe & Johnson, Washington, D. C., for American Telephone & Telegraph Company, et al.; James A. DeBois, American Tel. & Tel. Co., New York City, Bernard G. Segal, Barry Simon, Schnader, Harrison, Segal & Louis, Philadelphia, Pa., of counsel.
 Richard H. Markowitz, Miriam L. Gafni, Markowitz & Kirschner, Philadelphia, Pa., for Communications Workers of America; Charles V. Koons, Matthew A. Kane, Kane & Koons, Washington, D. C., of counsel.
 Elihu I. Leifer, Sherman, Dunn, Cohen & Leifer, Washington, D. C., Louis H. Wilderman, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for IBEW Council.
 Abraham Weiner, Paul M. Levinson, Mayer, Weiner & Levinson, New York City, for Alliance of Independent Telephone Unions.
 Before SEITZ, Chief Judge, and ALDISERT and GIBBONS, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 This is an appeal by three labor unions: the Communications Workers of America (CWA), the Telephone Coordinating Council TCC-1, International Brotherhood of Electrical Workers (IBEW), and the Alliance of Independent Telephone Unions (Alliance) (hereinafter referred to collectively as the intervening defendants). The order below denied their motions to modify a consent decree, dismissed the motion of CWA for a preliminary injunction against continued implementation of an affirmative action override provided for by the decree, and granted the motion of the plaintiffs and the original defendants for the entry of a supplemental injunctive order. The plaintiffs are the Equal Employment Opportunity Commission (EEOC), the Secretary of Labor, and the United States. Their complaint, filed on January 18, 1973, charged violations of the Fair Labor Standards Act, of Title VII of the Civil Rights Act of 1964, and of Executive Order 11246. The defendant is the American Telephone and Telegraph Company (AT&T), appearing for itself and on behalf of its associated telephone companies in the Bell System. On the same day that the complaint was filed AT&T answered, denying the violations alleged. However, it simultaneously approved and consented to a decree which embodied and was designed to enforce a negotiated agreement under which AT&T undertook to implement a model affirmative action program. That program was designed to overcome the effects of past employment discrimination in the Bell System with respect to women, blacks, and other minorities. The intervening defendants contend that the consent decree, as originally agreed to and as supplemented, conflicts with provisions of collective bargaining agreements between them and AT&T, and otherwise unlawfully invades rights of their members respecting competitive seniority in transfer and promotion.[1] We affirm.I. THE CONSENT DECREE
 
 
 2
 In November 1970, AT&T filed with the Federal Communications Commission (FCC) a proposed tariff which would increase interstate telephone rates. Before that filing was acted on, EEOC filed with the FCC a petition requesting that the increase be denied because AT&T's operating companies were engaged in systemwide discrimination against women and minorities. The FCC initiated a special proceeding to consider the charges, holding 60 days of hearings in 1971 and 1972. A number of organizations intervened in support of the EEOC. While the hearings progressed, settlement negotiations took place between AT&T and the government parties, which eventually led to the termination of the FCC special proceeding and the entry of the Consent Decree. Although the Alliance of Independent Telephone Unions did not participate in negotiating the Consent Decree, the IBEW did participate, and CWA was invited to do so but remained deliberately aloof. 365 F.Supp. at 1108, 1109.
 
 
 3
 The Bell System is one of the largest employers in the United States. Traditionally, its operating companies have been organized along departmental lines. The plant department has been responsible for installation and maintenance of physical facilities such as central office equipment, transmission lines, and subscriber telephones. The traffic department has been responsible for putting calls through, operator assistance, information, and related services. The commercial department has handled subscriber sales and billing. The accounting department has performed the bookkeeping and accounting functions. Until at least the late 1960's, Bell System hiring practices generally followed departmental lines. The plant department, in which craft jobs predominated, was traditionally a male preserve, while female employees were generally employed as operators, bookkeepers, or in other clerical occupations in the traffic and commercial departments. Pay scales at both entry and higher levels in the plant department were, and remain, higher than for employees with comparable length of service in the other departments. Transfers from the traffic or commercial departments were possible, but there was a general policy of slotting a transferred employee in at the next higher pay rate than that last enjoyed in the previous position. Since traffic and commercial employees had lower starting rates and lower rates at each step of the wage progression schedule, that policy resulted in a transferee to the plant department receiving a lower rate of pay than would an employee performing the same job who had been hired on the same date, but who had started in the plant department. These hiring practices resulted in a concentration of males and females in certain classifications. Moreover, there was an imbalance between the racial and ethnic composition of the work forces of many operating companies and the racial and ethnic makeup of their available labor markets. The intervening defendants do not dispute that past patterns and practices were discriminatory, nor do they dispute that the present work force in many Bell System departments still reflects those past patterns and practices.
 
 
 4
 The Consent Decree directs the Bell System Companies to establish goals and intermediate targets to promote the full utilization of all race, sex, and ethnic groups in each of fifteen job classifications. The intermediate targets, set annually, reflect the representation of such groups in the external labor market in relevant pools for each operating company's work force. The intermediate targets are the major prospective remedies in the Consent Decree. When any Bell Company is unable to achieve or maintain its intermediate target, applying normal selection standards, it is required by the decree to depart from those standards in selecting candidates for promotional opportunities. It must then pass over candidates with greater seniority or better qualifications in favor of members of the under-represented group who are at least "basically qualified." Without this affirmative action override, the greater time in title of incumbent members of the overrepresented race, sex, or ethnic group would inevitably reduce the opportunity for advancement of the under-represented groups and would perpetuate the effects of the former discrimination. The affirmative action override applies, however, only to minority promotional opportunity. A promotion under the override does not result in any increase in competitive seniority for purposes of layoff or rehire, as to which the collective bargaining agreements control.[2] The life of the decree is six years, ending on January 17, 1979. It provides that AT&T may bargain collectively with collective bargaining representatives for alternative provisions which would also comply with federal law. No such alternative provisions have been presented to the district court.
 
 II. THE SUPPLEMENTAL ORDER
 
 5
 In an interim report on compliance with the Consent Decree it appeared that in a number of specific categories the Bell Companies fell short of attaining intermediate targets promulgated for 1973. The government plaintiffs and AT&T jointly moved for the entry of a supplemental order aimed at remedying these deficiencies and assuring future achievement of targets and goals. The supplemental order provides that unmet targets shall be carried forward in certain establishments and job classifications. For a two month period ending on October 24, 1976 some Bell Companies were required to make all placements in affected job classifications from groups as to which their targets had not been met. The supplemental order also provides for the creation of a Bell System Affirmative Action Fund and its expenditure on projects which will advance the objects of the decree. It also articulates the understanding of the parties that while the original Consent Decree was not intended to supplant the collective bargaining agreements, to the extent that any provisions of the latter would prevent the achievement of the affirmative action targets and goals, the decree controlled. The carry-forward provisions of the supplemental order do not enlarge the Bell Companies' total affirmative action obligations under the Consent Decree, nor do they extend its life.
 
 III. BELL SYSTEM PROMOTIONAL SENIORITY
 
 6
 Since the only alleged conflict between the collective bargaining agreements and the Consent Decree and supplemental order relates to promotional seniority, our starting point is a description of bargained-for promotional practices. The contracts between AT&T and each of the intervening defendants are not identical. As to each intervening defendant there are also variations, in contracts with specific operating companies, negotiated locally to reflect local conditions and practices. However, a common feature of all the agreements is that seniority for all purposes is determined by "net credited service" in any department in the Bell System. It is also common to provide that in selecting employees for promotion, other factors being equal, the Company will promote the employee with the greatest net credited service. However, it is clear that the company has not bargained to the union any role in the determination of employee qualifications. Some agreements refer to "the employee whom Company finds is best qualified." Others speak of "ability, aptitude, attendance, physical fitness for the job, and proximity to the assignment." Some agreements even qualify the seniority-equal qualification language by language to the effect that "(n)othing in this paragraph shall be construed to prevent Company from promoting employees for unusually meritorious service or exceptional ability." Although their approach to the alleged conflict between the Consent Decree and their collective bargaining agreements is not identical the intervening defendants agree that the bargained-for promotional system is a merit selection system. Management determines the employee best qualified in its judgment, but seniority decides the issue where two employees are considered by management to be equally qualified. The effect of the affirmative action override, then, where and when it operates, is to eliminate from consideration those employees who would normally have been selected under pre-decree practice. The decree provides for selecting, from the under-utilized group of persons, those who in the judgment of management are "basically qualified." Although the briefs of the intervening defendants stress the issue of competitive seniority, the real dispute is less over seniority, which under the contracts would only be determinative in cases of equal qualification, as over the departure from the "best qualified" criterion. The continued operation of that criterion would, of course, significantly confine promotions within departmental lines, as has been the past practice, since experience in the department will always be a significant factor in an employee's qualification level. By executing the Consent Decree AT&T has agreed, in the instances in which the affirmative action override applies, to limit its bargained-for management prerogative of determining the employee best qualified for promotion, so long as it promotes a basically qualified applicant from an under-represented group. The unions urge that it may not do so without illegally breaching their collective bargaining agreements and the rights of some of the employees they represent.
 
 IV. THE UNION CONTENTIONS
 
 7
 Claiming standing as representatives of their members and by virtue of the conflict between the affirmative action override and the collective bargaining agreements, the intervenor unions attack the Consent Decree on a number of grounds. Some of these grounds transcend the issue of the purported conflict between the decree and the collective bargaining agreements. They recognize that in making their broad-gauged challenge they may be acting inconsistently with the best interests of some of the persons whom they represent in the collective bargaining process, but point out that this potential conflict is inherent in the collective bargaining relationship. See Emporium Capwell Co. v. Western Addition Community Organization, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975). Since the unions object to the claimed inconsistency between the decree and the promotional seniority provisions of their contracts, they have standing to assert all grounds of invalidity of the decree which would result in the elimination of that conflict. Moreover they are appropriate representatives of their members within the standing test of Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Thus we will consider each of their statutory and constitutional challenges, as well as the contention that entry of the decree was an abuse of the district court's discretion.
 
 
 8
 A. The Consent Decree and Third Party Interests
 
 
 9
 The unions contended in the district court, and contend somewhat less vigorously here, that it was improper in a Consent Decree to award relief affecting third party rights. That objection is meritless. To the extent that third party rights in which the unions are interested have been affected, they were allowed to intervene and be heard in this case. They do not dispute the factual predicate of the decree, the prior patterns and practices of discrimination. If this were a litigated judgment the fact that they and their members did not cause the discrimination would not prevent relief affecting third parties. See Franks v. Bowman Transp. Co., 424 U.S. 747, 778, 96 S.Ct. 1251, 47 L.Ed.2d 44 (1976). At best, in a fully litigated case, they would be entitled to be heard only on the appropriateness of the remedy. They have been heard on that aspect of the case. Class actions frequently affect the interests of persons who are before the court only by virtue of the opting out provisions of Fed.R.Civ.P. 23(c). We have approved the settlement of those actions even over the objection of class members who think additional relief should have been granted. E. g. Bryan v. Pittsburgh Plate Glass Co., 494 F.2d 799 (3d Cir.), cert. denied, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974); Ace Heating & Plumbing Company v. Crane Company, 453 F.2d 30 (3d Cir. 1971).
 
 
 10
 These cases hold that approval of such a settlement, arrived at after negotiations between the defendant and the class representative, will be reversed only if the court abused its discretion in approving it. There is, of course, a difference between approving a settlement benefiting a plaintiff class whose representative negotiated it, and approving a settlement imposing burdens on an unrepresented class of defendants. The recognition of that difference was the very reason why in Equal Employment Opportunity Commission v. American Telephone & Telegraph Company, supra, 506 F.2d at 741-42, we held that CWA could move to intervene as a defendant. Following intervention the unions were permitted a full opportunity to convince the court that the relief AT&T had agreed to went beyond that required to remedy the violation. The posture of the case before us is, for all practical purposes, that of a fully litigated decree.
 
 B. The § 703 Contention
 
 11
 Advancing essentially the same argument that we expressly rejected in United States v. Int'l Union of Elevator Const., 538 F.2d 1012, 1019 (3d Cir. 1976), the intervening defendants urge that §§ 703(a), 703(h) and 703(j) of Title VII, 42 U.S.C. §§ 2000e-2(a), (h), (j), prohibit the district court from providing for an affirmative action plan containing interim targets and goals, and prohibit an affirmative action override. As we noted in Elevator Constructors, that argument is foreclosed by Franks v. Bowman Transp. Co., supra, 424 U.S. at 757-62, 96 S.Ct. 1251. Even the Justices who wrote separately in Franks acknowledged that § 703 is not a statutory limitation upon the remedial authority conferred on the district courts by § 706(g), 42 U.S.C. § 2000e-5(g).
 
 C. The § 706(g) Contentions
 
 12
 The intervening defendants also urge several separate challenges to the decree, based on their interpretation of § 706(g). The first of these is that the section prohibits quota remedies, and that the interim targets and goals of the Consent Decree amount to such a remedy. That challenge is also foreclosed by Elevator Constructors, supra, and we will not repeat the analysis of the legislative history of the 1972 amendments to Title VII upon which we relied in rejecting it.[3]
 
 
 13
 The unions contend that Elevator Constructors is distinguishable in that it did not deal with competitive seniority but only with new hires. In one sense that is true, for the case dealt with a remedy in an industry where employers relied upon a hiring hall and a transitory work force. But the blunt fact is that the union membership quota remedy we approved in Elevator Constructors did involve competitive seniority with respect to referrals from a hiring hall. 538 F.2d at 1017-18. More significant than our decision in the hiring hall context, however, is the Supreme Court's holding in Franks v. Bowman Transp. Co., supra, that a change in competitive seniority is a permissible § 706(g) remedy. We are not free to reconsider the issue. Even if we were we do not think it is appropriately presented in this case, since the decree actually preserves layoff and rehire competitive seniority, and only modifies the method of selection for promotion and transfer. It affects not all seniority rights, but only some. And among two equally basically qualified under-represented group applicants, for example, the seniority provisions would still operate, even with respect to promotion and transfer.
 
 
 14
 The unions' major challenge to the decree, however, is that in all our prior Title VII remedy cases, and in those in the Supreme Court as well, the remedy provided relief only in favor of identifiable victims of specific past discrimination. They contend that § 706(g) proscribes any decree, even in a class action, which would permit relief to a minority group member who could not so identify himself.
 
 
 15
 The intervenor defendants misread our prior authority. Nothing in the decree which we approved in Elevators Constructors limited its applicability to blacks who had applied and been rejected for membership in the union. The decree ran to the benefit of the class of persons found to have been underutilized by virtue of a discriminatory pattern or practice. Moreover, the contention ignores the fact that in this case the United States sued to enforce Executive Order No. 11246. In Contractors Ass'n of Eastern Pa. v. Secretary of Labor, 442 F.2d 159 (3d Cir. 1971), we held that the Executive Order was a valid effort by the government to assure utilization of all segments of society in the available labor pool for government contractors, entirely apart from Title VII. Certainly that broader governmental interest is sufficient in itself to justify relief directed at classes rather than individual victims of discrimination. It is undisputed that the Bell System is a major governmental contractor.
 
 
 16
 We could rest on Elevator Constructors and Contractors of Eastern Pa. as controlling precedents in this Circuit. However, since it seems likely that review will be sought in the Supreme Court it is appropriate that we discuss the merits of the unions' contention that § 706(g) proscribes class relief to classes which may contain persons who are not identifiable victims of specific discrimination.
 
 
 17
 Before doing so, we note that even if we were to accept the unions' position on § 706(g), this decree would have a large scope of valid operation. The chief charge is that for years Bell System hiring practices steered certain classes of persons into certain departments. Any member of the affected class who became a Bell System employee during the time the practices operated was affected by them, at least to the extent that he or she was not informed that employment opportunities might exist in other departments. We do not think that Congress, in enacting Title VII, intended that § 706(g) remedies be available only to those knowledgeable enough and militant enough to have demanded and been refused what was not in fact available. All who became employees while the challenged employment practices operated were individual victims of the practice. Thus the unions' objection only goes to the possibility that some minority group members, hired after the offending practices ceased, might be able to take advantage of the affirmative action override. No record was made in the district court, by the intervening defendants or anyone else, to establish whether there is a significant number of such persons. Recognizing that there are thousands of class members who could validly be protected, even on the unions' construction of § 706(g), we would find it extremely difficult to set aside the decree in the absence of such a record. The district court in framing a remedy could certainly balance the possibility that some recent hires who were not affected by the offending prior practices might be advantaged against the practicality that the decree had to be simple enough in operation to achieve its main purpose. Thus, we would not reverse even if we agreed with the intervening defendants' interpretation of § 706(g).
 
 
 18
 That interpretation rests upon the last sentence of that subsection:
 
 
 19
 (n)o order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e-3(a) of this title.
 
 
 20
 The unions urge that any relief going beyond class members who can show that they, rather than the class to which they belong, have been discriminated against is proscribed.
 
 
 21
 The last sentence in § 706(g) must be read in light of the settled construction of the rest of the section. That settled construction is that once a prima facie showing is made that an employer has engaged in a practice which violates Title VII, the burden shifts to it to prove that there is a benign justification or explanation.[4] The last sentence of § 706(g) says precisely that. Obviously, an employer can meet an individual charge by showing that although that individual was a member of the disadvantaged class he was also a thief, or a drunk or an incompetent, and was for such a reason denied employment or promotion. But the sentence does not speak at all to the showing that must be made by individual suitors, or class representatives on behalf of class members, or the EEOC on behalf of class members. The sentence merely preserves the employer's defense that the non-hire, discharge, or non-promotion was for a cause other than discrimination. Nothing in the Consent Decree prevents AT&T from asserting that defense with respect to individual applicants for promotion, and it is difficult to see what interest the unions have in it.
 
 
 22
 The sparse legislative history available on the bills which became Title VII confirm our interpretation of the sentence. In H.R. 7152, what is now § 706(g) appeared as § 707(e). A section-by-section analysis contained in H.R.Rep.No.914, 88th Cong. 1st Sess. (1964), states of the latter:
 
 
 23
 "(n)o order of the court may require the admission or reinstatement of an individual as a member of the union or the hiring, reinstatement, or promotion of an individual as an employee or payment of any back pay if the individual was refused admission, suspended, or separated, or was refused employment or advancement, or was suspended or discharged for cause." EEOC, Legislative History of Titles VII and XI of Civil Rights Act of 1964 (hereinafter referred to as "Legislative History"), p. 2029 (emphasis supplied).
 
 
 24
 "For cause" clearly refers to an employer's defense. H.R.7152 went directly to the floor of the Senate, where major changes were made. None, however, substantively affected § 707(e) except that sex was included among the proscribed bases of discrimination, and the section was renumbered to § 706(g). Confirming the Senate's understanding that the last sentence merely preserved the employers' defense is the comparative analysis of the Senate and House bills printed in the Congressional Record on June 9, 1964:
 
 
 25
 Legislative History at 3027.
 
 
 26
 The intervening defendants rely on what they consider to be contrary indications in an explanatory memorandum on § 707(e) by Senators Clark and Case. Legislative History at 3044. We place no reliance on this ambiguous reference, since the section-by-section analysis quoted above is a more authoritative indication of congressional understanding. We also note that in considering the 1972 amendments to Title VII, Congress rejected the Ervin no-quota amendment to the 1972 Act. It did so after specific discussion of United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). The Ironworkers remedy, like that in our Elevator Constructors case, supra, included a new membership provision not limited to identifiable victims of specific past discrimination. As we pointed out in the latter case, the solid rejection of the Ervin amendment confirmed the prior understanding by Congress that an affirmative action quota remedy in favor of a class is permissible. 538 F.2d at 1019-20. We are reinforced in our conclusion that class relief, without regard to the victim status of every class member, is appropriate by the firm consensus in the courts of appeals upon the lawfulness of class-based hiring preferences and membership goals.[5]
 
 
 27
 We find meritless the proposal that we distinguish, for purposes of the availability of class action relief, between new hires and those already employed. Nothing in the language of the last sentence of § 706(g), upon which the intervening defendants base their individualized remedies argument, suggests such a distinction. Class action relief is equally available to both new hires and employees. The only distinction between the two classes is that in considering a seniority or promotion remedy, a court of equity must take into account expectations of other incumbent employees. But those incumbent employees will be affected identically by a remedy in favor of identifiable victims of specific discrimination as by a remedy which includes employee members not so identifiable. The impact on incumbent employees goes to the scope rather than the availability of class relief.[6]
 
 
 28
 Summarizing, none of the intervenors' interpretations of § 706(g), urged upon us as prohibitions against the intermediate targets, the employment goals, or the affirmative action override, persuade us.D. Abuse of Discretion
 
 
 29
 We turn then to the contention that even assuming the existence of statutory authority, the district court abused its discretion in refusing to grant the unions' motions to modify the Consent Decree, and in entering the Supplemental Order. As with equitable remedies generally, the scope of relief is a matter entrusted in the first instance to the trial court. As the Supreme Court has made plain, however
 
 
 30
 " . . . that discretion imports not the court's ' "inclination, but . . . its judgment; and its judgment is to be guided by sound legal principles." ' Discretion is vested not for purposes of limit(ing) appellate review of trial courts, or . . . invit(ing) inconsistency and caprice, but rather to allow the most complete achievement of the objectives of Title VII that is attainable under the facts and circumstances of the specific case. 422 U.S., at 421 (95 S.Ct. 2362.) Accordingly the District Court's denial of any form of seniority remedy must be reviewed in terms of its effect on the attainment of the Act's objectives under the circumstances presented by this record." Franks v. Bowman Transp. Co., supra, 424 U.S. at 770-71, 96 S.Ct. at 1267.
 
 
 31
 In Franks, the Court reviewed the denial rather than the award of relief, but it is equally relevant to the scope of appellate review of the award of relief as well. As we pointed out in Part IV A, supra this case comes to us after actual litigation by the intervening defendants over the scope of relief. Thus it is closer, procedurally, to Franks v. Bowman, supra, than to Bryan v. Pittsburgh Plate Glass Co., supra, and Kober v. Westinghouse Electric Corp., 480 F.2d 240, 247-50 (3d Cir. 1973), in which we reviewed settlements objected to by plaintiff class members. But whether we apply the standard of appellate review for litigated Title VII cases or that for review of settlements, considerable deference must be accorded the decision of the trial judge as to remedy.
 
 
 32
 The intervening defendants do not dispute that past hiring practices violated the law, that the makeup of the work force in many Bell System departments reflects the present effects of those past practices, or that continuance of the "best qualified" criterion for promotion, by rewarding experience in a given department, would tend to perpetuate those effects. Nor have they urged (except in their general attacks against all affirmative action targets and goals) that relating the targets and goals to minority representation in the available work force was error. They do contend that other means of attaining those goals might have been resorted to, and might be equally effective. But the decree preserves for the unions the opportunity to bargain collectively for such alternative means. The district court gave careful consideration to all the union's objections, and struck an appropriate balance between the integrity of the collective bargaining process and the necessity for effective relief. The affirmative action override was not applied across the board, but only when necessary to bring particular work units into compliance. The intermediate targets and the goals remain subject to periodic review and adjustment. The decree is short lived. It makes no intrusion upon competitive seniority for layoffs or rehires. In the circumstances we cannot say that the court abused its discretion.
 
 E. Constitutional Challenges
 
 33
 Finally, the intervening defendants challenge the decree on the ground that any court-imposed remedy requiring a quota, target or goal defined in terms of sex, race or national origin violates the due process clause of the fifth amendment. In its broadest reach, this argument is that any class action remedy for discrimination against minorities is unconstitutional, for any such remedy of necessity defines the protected class. We are not asked to go quite that far. The unions do not object to the provisions of the decree prohibiting employment discrimination in the future. Their objection is to the provisions for overcoming the effects of past practices. We have rejected the same constitutional arguments against affirmative action remedies in the past. United States v. Int'l Union of Elevator Const., supra, 538 F.2d at 1018; Erie Human Relations Comm'n v. Tullio, supra; Contractors Ass'n of Eastern Pa. v. Secretary of Labor, supra, 442 F.2d at 176. See Oburn v. Shapp, 521 F.2d 142, 149 (3d Cir. 1975) (Garth, J.). The intervening defendants would have us distinguish these cases because they did not involve competitive seniority, and thus did not involve contractual interests of other employees. We pointed out above that Elevator Constructors did involve competitive seniority. But in any event the proposed distinction is unavailing. Franks v. Bowman Transp. Co., supra, holds that the contractual interest of an employee in competitive seniority must yield to an appropriate Title VII remedy. See 424 U.S. at 778, 96 S.Ct. 1251. Federal statutory remedies need not be color blind or sex unconscious.[7]
 
 
 34
 We recognize that the remedy adopted by the district court can operate to the disadvantage of members of groups which have not previously been discriminated against compared to members of sex or racial groups previously subject to discrimination who have not themselves been discriminated against. The remedy thus constitutes federal action which classifies by membership in a sex or racial group, and must be held invalid under the equal protection guarantee inherent in the due process clause of the Fifth Amendment unless it can be shown that the interest in making the classification is sufficiently great.
 
 
 35
 The standard applied by the Court in evaluating that interest has differed somewhat for sex as opposed to racial classifications. Racial classifications are subject to strict scrutiny: the federal "purpose or interest" must be "both constitutionally permissible and substantial," and the "use of the classification" must be " 'necessary . . . to the accomplishment' of (the) purpose or the safeguarding of (the) interest." In re Griffiths, 413 U.S. 717, 721-2, 93 S.Ct. 2851, 2855, 37 L.Ed.2d 910 (1973) (footnotes omitted). On the other hand, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976). The present classifications are permissible in the case of race, and are thus permissible a fortiori with respect to sex.
 
 
 36
 The federal interest in the present case is that of remedying the effect of a particular pattern of employment discrimination upon the balance of sex and racial groups would otherwise have obtained an interest distinct from that of seeing that each individual is not disadvantaged by discrimination, since it centers on the distribution of benefits among groups. This purpose is "substantial" within the meaning of In re Griffiths, supra,[8] where the Supreme Court said that "a State does have a substantial interest in the qualifications of those admitted to the practice of law . . . " 413 U.S. at 725, 93 S.Ct. at 2856. The governmental interest in having all groups fairly represented in employment is at least as substantial, and since that interest is substantial[9] the adverse effect on third parties is not a constitutional violation. Moreover, the same exclusion of such members could conceivably result from remedies afforded to individual victims of discrimination. This remedy operates no differently. Furthermore, as we noted above, the affirmative action override is necessary to the practical accomplishment of the remedial goal.
 
 
 37
 It will doubtless be possible to detail, and thus to employ remedies other than quotas, for many individual instances of discrimination. But it is also true that much discrimination cannot be proved through evidence of individual cases, even though a prima facie case can be made out on the basis of statistical or other evidence. It will, for example, be nearly impossible to show that individuals were deterred from applying for hiring or promotion, or from attempting to meet the prerequisites for advancement, because of their well-founded belief that a particular employer would not deal fairly with members of their particular sex or racial group. Moreover, even apart from problems of proof, goals and quotas are necessary to counteract the effects of discriminatory practices because some victims of discrimination no longer seek the job benefits which they were discriminatorily denied. In such cases, quotas are needed to counteract the effects of discriminatory practices upon the balance of sex and racial groups that would otherwise have obtained.
 
 
 38
 The use of employment goals and quotas admittedly involves tensions with the equal protection guarantee inherent in the due process clause of the Fifth Amendment. But the remedy granted by the district court is permissible because it seems reasonably calculated to counteract the detrimental effects a particular, identifiable pattern of discrimination has had upon the prospects of achieving a society in which the distribution of jobs to basically qualified members of sex and racial groups is not affected by discrimination.
 
 
 39
 The judgment appealed from will be affirmed.
 
 
 
 [1]
 The decision appealed from is reported. Equal Employment Opportunity Commission v. American Telephone & Telegraph Company, 419 F.Supp. 1022 (E.D.Pa.1976). The prior history of this protracted litigation may be gleaned from Equal Employment Opportunity Commission v. American Telephone & Telegraph Company, 506 F.2d 735 (3d Cir. 1974) affirming in part and remanding in part 365 F.Supp. 1105 (E.D.Pa.1973). In that case, we recognized that CWA would have standing to intervene as a defendant to protect its existing collective bargaining agreements. Thereafter CWA, IBEW and Alliance moved for and were granted leave to intervene as defendants for the purpose of seeking modification of the consent decree
 
 
 [2]
 The consent decree, Part A, § III-C provides:
 Net credited service shall be used for determining layoff and related force adjustments and recall to jobs where nonmanagement female and minority employees would otherwise be laid off, affected or not recalled. Collective bargaining agreements or Bell Company practices shall govern the confines of the group of employees being considered. Provided, however, vacancies created by layoff and related force adjustments shall not be considered vacancies for purposes of transfer and promotion under this Section.
 
 
 [3]
 538 F.2d 1012, 1019-20
 
 
 [4]
 United States v. Int'l Union of Elevator Const., 538 F.2d 1012, 1017 & n. 8 (3d Cir. 1976). See Franks v. Bowman Transp. Co., 424 U.S. 747, 772, 96 S.Ct. 1251, 47 L.Ed.2d 44 (1976). Cf. Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 95 S.Ct. 1817, 36 L.Ed.2d 668 (1973)
 
 
 [5]
 E. g., United States v. Elevator Constructors Local 5, supra; Rios v. Steamfitters Local 638, 501 F.2d 622 (2d Cir. 1974); United States v. Wood Lathers Local 46, 471 F.2d 408 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973); United States v. N. L. Indus. Inc., 479 F.2d 354 (8th Cir. 1973); NAACP v. Beecher, 504 F.2d 1017 (1st Cir. 1974), cert. denied, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); United States v. IBEW Local 38, 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); Morrow v. Crisler, 491 F.2d 1053 (5th Cir.), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); Southern Illinois Builders Ass'n v. Ogilvie, 471 F.2d 680 (7th Cir. 1972); United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); Patterson v. American Tobacco Co., 535 F.2d 257 (4th Cir.), cert. denied, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286, 45 U.S.L.W. 3350 (U.S. Nov. 2, 1976) (Nos. 76-46, 76-56). Cf. Albemarle Paper Co. v. Moody, 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370, 45 L.Ed.2d 280 (1976):
 The petitioners also contend that no backpay can be awarded to those unnamed parties in the plaintiff class who have not themselves filed charges with the EEOC. We reject this contention. The Courts of Appeals that have confronted the issue are unanimous in recognizing that backpay may be awarded on a class basis under Title VII without exhaustion of administrative procedures by the unnamed class members. See, e. g., Rosen v. Public Service Electric & Gas Co., 409 F.2d 775, 780 (C.A.3 1969), and 477 F.2d 90, 95-96 (C.A.3 1973); Robinson v. Lorillard Corp., 444 F.2d 791, 802 (C.A.4 1971); United States v. Georgia Power Co., 474 F.2d 906, 919-921 (C.A.5 1973); Head v. Timken Roller Bearing Co., 486 F.2d 870 at 876; Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 719-721 (C.A.7 1969); United States v. N. L. Industries, Inc., 479 F.2d 354, 378-379 (C.A.8 1973). The Congress plainly ratified this construction of the Act in the course of enacting the Equal Employment Opportunity Act of 1972, Pub.L. 92-261, 86 Stat. 103.
 
 
 [6]
 See, e. g., Ostapowicz v. Johnson, 541 F.2d 394 (3d Cir. 1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); Erie Human Relations Comm'n v. Tullio, 493 F.2d 371 (3d Cir. 1974); Commonwealth v. O'Neill, 473 F.2d 1029 (3d Cir. 1973) (per curiam) (in banc ); Kirkland v. New York State Dept. of Correctional Serv., 520 F.2d 420, 430 (2d Cir. 1975), cert. denied, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976)
 
 
 [7]
 Our conclusion is strengthened by the Supreme Court's recent decision in United Jewish Organization of Williamsburgh, Inc. v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). There, the Court held that racial quotas could permissibly be used to effect legislative reapportionment pursuant to a constitutional federal statute. The claims of discrimination by petitioners were unavailing where the racial reapportionment was designed to remedy the effects of past discrimination. See also Franks v. Bowman Transp. Co., supra, 424 U.S. at 775 & n. 35, 96 S.Ct. 1251; United States v. Bethlehem Steel Corp., 446 F.2d 652, 663 (2d Cir. 1971); Vogler v. McCarty, Inc., 451 F.2d 1236, 1238-39 (5th Cir. 1971)
 
 
 [8]
 The Court said in footnote 9 of its opinion that: "The state interest required has been characterized as 'overriding,' (McLaughlin v. Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964)); Loving v. Virginia, 388 U.S. 1, 11 (87 S.Ct. 1817, 18 L.Ed.2d 1010) (1967); 'compelling,' Graham v. Richardson, (403 U.S. 365, 375, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971)); 'important,' Dunn v. Blumstein, 405 U.S. 330, 343 (92 S.Ct. 995, 31 L.Ed.2d 274) (1972), or 'substantial,' ibid. We attribute no particular significance to these variations in diction."
 
 
 [9]
 See findings in House Judiciary Committee Report on H.R.7152, reprinted in E.E.O.C., Legislative History of Titles VII and XI of Civil Rights Act of 1964 at 2018