**SHAHMOON INDUSTRIES, INC.,**
**Plaintiff,**

v.

**UNITED STEELWORKERS OF AMERICA, AFL–CIO, and Local 5216,**
**Defendants.**

**Civ. A. No. 196–64.**

United States District Court
D. New Jersey.

Dec. 29, 1966.

John W. Noonan, Newark, N. J., for plaintiff; Sidney R. Rossiter, New York City, of counsel.

Rothbard, Harris & Oxfeld, Newark, N. J., for defendants; by Abraham L. Friedman, Newark, N. J.

## OPINION

AUGELLI, District Judge.

This action is here on removal from the Superior Court of New Jersey. Plaintiff (Shahmoon) seeks to set aside or modify an arbitration award. Defendants (Union) counterclaim to have the award confirmed. The jurisdiction of this Court is invoked under 29 U.S. C.A. § 185.

For some years Shahmoon has operated an iron mine and rock quarry in Mount Hope, New Jersey. In 1956, Shahmoon and the Union entered into a collective bargaining agreement. This agreement was amended from time to time. In the intervening years, economic conditions necessitated periodic layoffs and rehiring of Shahmoon employees. Prior to April 19, 1963, the collective bargaining agreement then in force provided that an employee would lose his job status after a layoff of two years. On April 19, 1963, Shahmoon and the Union, following negotiations, and after the termination of a six month strike, executed a new labor contract which, inter alia, extended from two to five years, the seniority and recall rights of Shahmoon employees.

After the strike ended, Shahmoon, in connection with an expansion of its operations, commenced a recall of employees on layoff status. Included among these was one John Korpos. The employment of recalled men was made subject to a policy unilaterally established by Shahmoon which, as appears from the arbitrator's opinion and award in this case, operated as follows:

"All employees about to be recalled were requested to take a physical examination. The Company scrutinized the results of the examination to determine if (a) the employee's chest x-ray showed signs of 'dust'—silicosis— or (b) if the examination of his back indicated that he was not suited for heavy lifting duties. In the event either of these conditions was found, the

Company refused to assign men to certain jobs which it considered, in its own judgment, to be extraordinarily 'dusty' and hence likely to aggravate a silicosis case, or which required heavy lifting if the problem was a back injury.

"If an employee filed a Workmen's Compensation claim for silicosis, and the Company doctor found no sign of the disease, but petitioner's doctor found a disability, the Company took the following position: If the Workmen's Compensation Commission found no silicosis, there would be no restriction on the employee's job opportunities, but if the Commission found silicosis on the basis of medical testimony of petitioner's doctor, the Company considered this finding conclusive and restricted the job opportunities of the employees to 'dust free' jobs. This policy was applied not only to newly recalled employees, but to employees who had been placed on a job before the Workmen's Compensation award was rendered. The application of the policy as well as the policy itself is challenged as inconsistent with the seniority provisions of the contract."

The collective bargaining agreement between Shahmoon and the Union, in Article 11 thereof, prescribed a four-step grievance procedure. If resort thereto did not resolve a grievance, the same was required to be submitted to arbitration. Article 12 of said agreement, dealing with arbitration, contained a provision that the arbitrator was not empowered to add to, subtract from, amend, modify, or supplement, any of the terms of the agreement, but said article declared it to be the intention of the parties that all differences between them, or any employee, should be settled by agreement, or failing agreement, by arbitration. Also included in Article 12 was a "no strike" and "no lock-out" clause.

Article 9A2 of the collective bargaining agreement, dealing with the seniority status of Shahmoon employees on layoff and recall, so far as is here pertinent, provided that:

" * * * Men who are laid off shall, during periods of less than full plant operations, be recalled on the basis of plant-wide seniority for any job in any department where they can qualify; and they shall return to their regular job when it becomes available. An employee incapacitated because of age or physical disability may be transferred, by mutual agreement of the Parties, * * *."

On May 3, 1963, John Korpos, the recalled Shahmoon employee previously mentioned, filed a grievance, S–160, in which he charged that Shahmoon, in violation of the seniority provisions of the collective bargaining agreement, was "examining recalled Union members and making such examination a condition of employment." This grievance was duly processed, with Shahmoon denying any violation of the agreement, following which the grievance was submitted to arbitration.

The record of the arbitration proceedings reveals divergent views concerning the extent and scope of the Korpos grievance, and the issue or issues intended to be resolved thereby. Shahmoon contended it had the right, on recall of employees, to require a physical examination as a condition of reemployment. The Union, while not objecting to the physical examinations, vigorously disputed Shahmoon's asserted right to use the results of such examinations as the determinative factor in placing recalled men in jobs other than those to which they would normally be entitled on the basis of their seniority rights. It was claimed that Shahmoon's unilateral action in this regard, without Union approval, was in contravention of Article 9A2 of the collective bargaining agreement. Shahmoon also took the position before the arbitrator that any award made by him could apply only to Korpos. The Union countered with the argument that the Korpos grievance was merely the vehicle used to test Shahmoon's right to make the results of physical examinations a condition of reemployment, and that all employees, situated as was Korpos, came

within the intendment of the specific grievance submitted for arbitration. These opposing contentions of the parties took place against a testimonial background touching upon the hazardous nature of the work performed by Shahmoon employees. There was medical testimony regarding the different stages of silicosis and the effect thereof on an employee's ability to continue working in "dust-laden" jobs; also, the ability of employees with back injuries to work in jobs requiring heavy lifting. There was also testimony before the arbitrator that one of the main issues involved in the strike preceding the signing of the April 19, 1963 agreement, was the extension of the seniority and recall rights of Shahmoon employees from two to five years; that during the negotiations leading up to the settlement of the strike, it was anticipated that there would be a recall of employees on lay-off status; that at no time during these negotiations was any mention made of the requirement of physical examinations as a condition of reemployment; and that on recall, it was expected that an employee would have the right to return to his own job if it was available.

The record contains much colloquy between the arbitrator and representatives of the parties regarding the issue or issues to be decided by the submission. In response to Shahmoon's request that the issue of the grievance be stated, the arbitrator said, "the basic one is whether or not the company is entitled to take action with the job status * * * of a recalled employee on the basis of a medical examination without, first, securing the approval of the union under Section 9A–2 of the contract." And again, the arbitrator stated it to be his understanding that the grievance was intended to embrace employees not recalled because of the results of physical examinations, as well as employees recalled and put in jobs other than those to which they were entitled by reason of their seniority. Shahmoon's position was that it would like to have the arbitrator decide, as the arbitrable issue, its right to make physical examinations a condition of employment. The bone of contention revolved around the use of Shahmoon of the results of such examinations in determining unilaterally the job status of recalled employees.

There was also a discussion of "back pay" for the "employees" involved. The record is not too clear with respect to Shahmoon's position on this phase of the case. It does appear, however, that Shahmoon was not so much concerned about whether the Korpos grievance covered one or more individuals, as it was to have the arbitrator decide that Shahmoon was within its rights in instituting the unilateral policy relating to the placement of recalled employees.

The arbitrator, after devoting three days to a hearing of the matter, made an award in favor of the Union in which he concluded that Shahmoon had "violated the collective bargaining agreement between the parties by restricting the jobs which employees may hold because of defects found in physical examinations or because of determinations of silicosis disability made by the Workmen's Compensation Commission * * *." It was determined that Article 9A2 of the collective bargaining agreement provided the exclusive method for dealing with job transfers of employees who became incapacitated because of age or physical disability, and that Shahmoon could not unilaterally make such job transfers under Article 9A2 without the consent of the Union. The arbitrator also decided that eight other employees, in addition to John Korpos, were affected by the Shahmoon policy on recall, and that these men were embraced in the issue stated in the Korpos grievance; also, that such employees and Korpos were entitled to back pay in accordance with the formula laid down by the arbitrator.

Shahmoon contends that the arbitrator in making this award exceeded his authority and decided matters that were outside the scope of the submission. In the state court, Shahmoon's action was brought pursuant to N.J.S. 2A:24–8, N.J. S.A. That statute, in relevant part, is practically identical with the federal act, 9 U.S.C.A. § 10, which provides for the vacation of an arbitration award

14

"[w]here the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." The cited statutory ground asserted by Shahmoon to vacate or modify the award in this case must be read in light of the rule that a court's function in confirming or vacating an award "is severely limited", since, if it were otherwise, the ostensible purpose for resorting to arbitration, which is the avoidance of litigation, would be frustrated. See Amicizia Societa Navegazione v. Chilean Nitrate and Iodine Sales Corporation, 274 F.2d 805 (2 Cir. 1960).

It is, of course, elementary that an arbitrator may not decide matters outside of the issues submitted for arbitration. See Textile Workers Union of America v. American Thread Company, 291 F.2d 894 (4 Cir. 1961). But it is only when the arbitrator clearly goes beyond the scope of the submission that the courts will interfere. Every presumption is in favor of the award's validity, and the person challenging an award has the burden of showing that the arbitrator exceeded his authority. See Burchell v. Marsh, 17 How. 344, 58 U.S. 344, 15 L.Ed. 96 (1854); Amicizia Societa Navegazione v. Chilean Nitrate and Iodine Sales Corporation, supra.

Arbitration of labor disputes under collective bargaining agreements differ in function and approach from arbitration under ordinary commercial contracts. On June 20, 1960, the Supreme Court of the United States decided the cases of United Steelworkers of America v. American Manufacturing Company, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf Navigation Company, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corporation, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424. This trilogy of cases provides guidance for the approach courts are to follow in disputes arising under labor contracts containing arbitration clauses. The significance of the principles laid down in those cases, and their application, is better appreciated when read in conjunction with the dissenting opinion of Mr. Justice Whittaker in Warrior.

In American, the court pointed out that "[a]rbitration is a stabilizing influence only as it serves as a vehicle for handling any and all disputes that arise under the agreement." It went on to say that:

"In our role of developing a meaningful body of law to govern the interpretation and enforcement of collective bargaining agreements, we think special heed should be given to the context in which collective bargaining agreements are negotiated and the purpose which they are intended to serve. * * * The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for. The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. * * * When the judiciary undertakes to determine the merits of a grievance under the guise of interpreting the grievance procedure of collective bargaining agreements, it usurps a function which under that regime is entrusted to the arbitration tribunal."

In Warrior, the court repeated the holding of Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, to the effect that "[t]he present federal policy is to promote industrial stabilization through the collective bargaining agreement". It al-

so stated that a collective bargaining agreement

"is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. * * * Gaps may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement. Many of the specific practices which underlie the agreement may be unknown, except in hazy form, even to the negotiators. Courts and arbitration in the context of most commercial contracts are resorted to because there has been a breakdown in the working relationship of the parties; such resort is the unwanted exception. But the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement."

In the same case the court points out that

"[t]he labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such fac-

tors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. * * * In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, * * *."

In Enterprise, the court said that

"[t]he refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards."

The court further stated that:

"When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."

The arbitrator's opinion in Enterprise was ambiguous on the issues of back pay and reinstatement of employees. As to this, the court declared that "[a] mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded

# 16

his authority, is not a reason for refusing to enforce the award." And further, that a "plenary review by a court of the merits [of an award] would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final." So far as the arbitrator's decision concerns construction of the collective bargaining agreement, "the courts have no business overruling him because their interpretation of the contract is different from his."

■ With these principles in mind, consideration will now be given to Shahmoon's contention that the arbitrator exceeded his authority in making the award here being challenged. This Court is not, of course, concerned with the merits of the controversy submitted to arbitration. The arbitrability of the issue submitted is not disputed. The question posed for decision is whether or not, in light of the circumstances of this case, the arbitrator went beyond the scope of the submission. In this connection it is appropriate to examine the language of the Korpos grievance. That grievance, signed only by John Korpos, read as follows:

> "The Co [Shahmoon] is examining recalled Union members and making such examination a condition of employment. In violation of the seniority provisions of the Collective bargaining agreement."

■ A strict interpretation of the language of the submission might conceivably support Shahmoon's contention that the only issue submitted to arbitration was Shahmoon's right to require recalled employees to submit to physical examinations. The same language, however, is also susceptible of the interpretation placed upon it by the Union and the arbitrator that Shahmoon was using the results of such examinations as a condition of reemployment in violation of the collective bargaining agreement. The grievance was not prepared by a lawyer or some expert in the field of labor relations. Rather, it appears to have been written by Korpos himself or perhaps a union delegate. In any event, grievances submitted to arbitration need not be couched in language comparable to that used in formal court proceedings. American Bosch Arma Corporation v. International Union of Electrical, Radio and Machine Workers, 243 F.Supp. 493 (N.D. Miss.1965).

To adopt Shahmoon's restrictive interpretation of the Korpos grievance would, in the opinion of this Court, be inconsistent with the liberal federal policy governing the arbitration of disputes under collective bargaining agreements. The crux of the Korpos grievance, read in light of the surrounding circumstances, was not that he was required to take a physical examination, but that as a result of such examination he was denied a return to his regular job, and that his assignment by Shahmoon to another job was violative of his seniority rights under the collective bargaining agreement. Thus, a fair reading of the Korpos grievance supports the Union's contention that Shahmoon was unilaterally using the "results" of the physical examinations of recalled employees in violation of the seniority provisions of the collective bargaining agreement.

■■ It follows, therefore, that the arbitrator, in deciding that Shahmoon violated the collective bargaining agreement by using the results of physical examinations to unilaterally restrict employees to certain jobs, did not exceed the scope of the grievance submitted to him. Nor can it be said that the arbitrator exceeded his authority in awarding relief to the few additional Shahmoon employees who likewise were subjected to job restrictions because of the results of their physical examinations. While it is true that grievance S–160 was signed only by John Korpos, it is clear from the record that the broad issue the parties submitted to arbitration was the Shahmoon policy of unilaterally making the results of physical examinations a condition of reemployment. The Korpos grievance refers to union "members" and not to Korpos individually. Shahmoon's understanding that company policy was involved is clearly indicated by plaintiff's

exhibits 2, 6 and 8. See John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); Association of Westinghouse Salaried Employees v. Westinghouse Electric Corporation, 283 F.2d 93 (3 Cir. 1960).

■ On the issue of back pay Shahmoon, consistent with its contention that the Korpos grievance alone was at issue, argued that if back pay was to be awarded, it could only be awarded to Korpos. If, as already stated, the Korpos grievance was used as a vehicle to test the propriety of Shahmoon's policy of requiring physical examinations of recalled employees, and the results thereof as a condition of reemployment, the award of back pay to all employees affected by the challenged policy would seem to be a proper subject for decision by the arbitrator. The arbitrator was unable, on the basis of the record before him, to determine the amount of back pay, if any, due the employees covered by his award. He did, however, lay down a general formula for ascertaining the amount due, leaving the parties free to refer back to him such back pay questions as could not be resolved. See United Steelworkers of America v. Enterprise Wheel & Car Corporation, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424; Local 2130, International Brotherhood of Electrical Workers v. Bally Case & Cooler, Inc., 232 F.Supp. 394 (E.D.Pa.1964); American Bosch Arma Corporation v. International Union of Electrical, Radio and Machine Workers, 243 F.Supp. 493 (N.D.Miss.1965).

Upon a consideration of the entire record, this Court concludes that the arbitrator did not exceed his authority in making the award in this case. Under the circumstances, the complaint will be dismissed and judgment entered on the counterclaim confirming the award and directing compliance therewith by Shahmoon.

This opinion shall constitute findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure. Counsel for defendants will please submit an appropriate order, on notice to counsel for plaintiff.