TELEPHONE WORKERS UNION OF NEW JERSEY, LOCAL 827, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO and Bertha Biel, Plaintiffs,

v.

NEW JERSEY BELL TELEPHONE COMPANY and Equal Employment Opportunity Commission, F. Ray Marshall, Secretary of Labor, and the United States of America, Defendants.

Civ. No. 76-1392.

United States District Court, D. New Jersey.

Sept. 8, 1977.

Paul Levinson by Abraham Weiner, New York City, for plaintiffs.

Thomas E. Walsh, Jr., Newark, N. J., C. Daniel Karnes, Equal Employment Opportunity Commission, Washington, D. C., for defendants.

## OPINION

LACEY, District Judge.

This matter is before the court on the parties' cross motions for summary judgment.

This is an action by plaintiffs Telephone Workers Union of New Jersey, Local 827, International Brotherhood of Electrical Workers, AFL–CIO, [both hereinafter referred to as "Union"], and Bertha Biel against defendant New Jersey Bell Telephone Company [the Company], pursuant to section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, seeking specific enforcement of an arbitration award.

The Equal Employment Opportunity Commission [EEOC], F. Ray Marshall, Secretary of Labor, and the United States moved, on April 11, 1977, for leave to intervene as parties defendant, which motion was granted.

The material facts in the case are not in dispute.

The Union, as the recognized collective bargaining representative of all non-supervisory employees in defendant's Plant and Engineering Departments, entered over the years into successive agreements with the Company covering the wages, hours and conditions of employment of such employees, one of whom was plaintiff Biel. The current agreement runs from July 21, 1974 to August 6, 1977. Its predecessor ran from May 29, 1971 to July 20, 1974. The events giving rise to this proceeding began under the earlier agreement and continued into the current agreement. All contract provisions pertinent to this case are identical in both agreements. Such provisions appear in their entirety in Exhibit B of the Complaint.

The agreements set forth job titles and their negotiated rate of pay. Involved in this case are the job titles of "Records Clerk" and "Operations Clerk."

In 1958 the Company employed persons in the capacity of "Construction Clerk." This title existed until 1963 when it was changed to "Operations Clerk." The duties and responsibilities, however, remained the same. They include generally the performance of clerical functions associated with the construction forces such as record keeping, answering calls, dispatching, and operating a message center. Transcript of Arbitration Proceeding, Defendant's Brief, Exhibit B, at 74–76. The title is one to which lower rated employees, including "Records Clerks," are promoted. Transcript at 83.

On March 29, 1973 plaintiff Biel, a records clerk, applied for promotion to a higher paid job when the position of operations clerk opened. She was initially employed by the New York Telephone Company in 1963. She worked there until 1968 when she was transferred to the Company where she worked as a repair service clerk and a records clerk in Atlantic City. Transcript at 193.

On October 29, 1973 the Company filled this opening by hiring a white male, Everett, "from off the street." Transcript at 197.

During the period 1955 through 1958 the Company hired a substantial number of persons into higher rated jobs. Contract negotiations between plaintiff Union and the Company took place in 1958. Because of extensive hiring into higher rated titles, plaintiff Union demanded that the Company agree to promote entirely from within the bargaining unit from the lowest title progressively into the higher titles. Transcript at 76, 77. The Union's demand as stated in the minutes of the 1958 negotiations is as follows: "The Union wants the assurance that its members will be provided job opportunities before applicants or less

senior employees are given them." This was received in evidence as Company Exhibit 3 in the arbitration proceeding. *See* Exhibit E.

The Company denied the Union's demand and the contract was signed without granting the Union's request. Transcript at 79.

Thereafter, the Company unilaterally formulated and implemented a Trial Hiring Plan. Defendant's Brief, Exhibit F. This was received in evidence in the arbitration proceeding as Company Exhibit 2. This was presented to the Union after negotiations had been agreed to and signed. Transcript at 79. By the terms of the Trial Hiring Plan the Company advised the Union that it would, on a *trial* basis:

1. Upgrade qualified employees from lower graded titles giving due consideration to ability, aptitude, attendance, physical fitness, proximity to assignment and seniority.

2. Hire directly into higher rated titles if there are no employees in lower rated titles who are qualified in management's opinion and who had one year in the present title.

3. Otherwise promote lower graded titles including construction clerk (which title was later changed to operations clerk).

The Trial Hiring Plan lasted until 1966. During this period the Company followed the procedures set forth therein and generally promoted from within before hiring "off the street." Transcript at 85.

Contract negotiations also took place in 1966. During these negotiations the Union, acknowledging that the Trial Hiring Plan did not have the status of an agreement, proposed to incorporate it into the contract. As in 1958, the Company rejected the Union's demand. Transcript at 89. Although the Trial Hiring Plan as such ended in 1966, the Company continued to follow its procedures. However, it continued to hire extensively into higher graded jobs after 1966. Although negotiations took place in 1968, 1971 and 1974, there were no further discussions of this subject.

Article XV of the Collective Bargaining Agreement [Agreement], entitled "Seniority in Promotions," Complaint, Exhibit B, at 19–20, provides in section one that: "When selecting employees for promotion to jobs within the bargaining unit . . . the company will consider ability, aptitude, attendance, physical fitness for the job, and proximity to the assignment." This section goes on to say that if these qualifications "are substantially the same as between two (2) or more individuals," the senior employee shall be offered the promotion. The term "net credited service" is "seniority."

Section three of this article states that: "The provisions of Section 1 . . . shall not apply . . . to those hired on a *temporary* basis," thus applying to those hired on a permanent basis only.

Section four of Article XV calls for arbitration of unresolved disputes regarding the application of section one but *"the decision of the company shall be controlling unless the company is shown to have acted arbitrarily or in bad faith."*

Article XI, Complaint, Exhibit B, at 17, is the "Arbitration" clause. It lists the subjects which are arbitrable and includes among them Article XV, section four. Section two of Article XI defines the scope of authority of the Board of Arbitration:

The Board of Arbitration in its decision shall be bound by the provisions of the Agreement and shall not have the power to add to, subtract from, or modify any provision of this Agreement.

In the Agreement at 98–100 appears the "Procedure for Arbitration." Section one describes the method of selecting the Board of Arbitration. Section two provides that:

The decision of a majority of said Board of Arbitration shall be the decision of the Board of Arbitration. Such decision shall be final, and the Union and its members and the Company agree to abide by such decision, which shall be enforceable by appropriate action or proceeding, if necessary, in a court of law or equity or otherwise.

The final Article having some relevance here is Article XVII, entitled "Nondiscrimi-

nation," Complaint, Exhibit B, at 22, the pertinent portion of which states:

Neither the Company nor the Union shall unlawfully discriminate against any employee because of such employee's race, color, religion, sex, national origin or age.

In 1970 the Equal Employment Opportunity Commission intervened in an application by American Telephone and Telegraph Company [A.T.&T.] for a rate increase before the Federal Communications Commission. It contended that the rate increase should be denied as the operating companies systematically discriminated against females and minorities.

During proceedings before the Federal Communications Commission, A.T.&T. and its subsidiary companies, including the Company, were charged with employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq.; the Equal Pay Act of 1963, 29 U.S.C. § 206; and Executive Order No. 11246, 3 C.F.R. 11246 (Supp.1973). During the course of these proceedings 60 days of hearing were held and over 8,000 pages of testimony and records were introduced by the EEOC with respect to the Bell Companies' employment practices.

During 1972 the Union and the Company met to discuss these proceedings. At a May 1972 meeting the Union was advised that the Company would mostly hire into entry level jobs but reserved the right to hire into above entry level jobs. Another meeting was held in October 1972 in which the subject of goals was again discussed with the Union. Transcript at 240, 241. The Union did not seek to intervene in the proceedings pending before the Federal Communications Commission. The Union appears to have been aware of the proceedings. Judge Higginbotham, in his decision in *Equal Employment Opportunity Commission v. American Telephone and Telegraph Company,* 365 F.Supp. 1105 (E.D.Pa.1973), *modified,*

506 F.2d 735 (3d Cir. 1974), stated that he determined that discussions concerning settlement of the proceedings took place between attorneys for the International Brotherhood of Electrical Workers [IBEW] and EEOC, which discussions concerned the impact of any possible settlement or litigation on the interest or expectations of IBEW's membership. Judge Higginbotham noted that there were approximately 20 telephone conversations between IBEW and EEOC and Company representatives between September 29, 1972 and February 17, 1973. He also found that several meetings took place with representatives of the IBEW at its request during later stages of negotiations between the Office of Federal Contract Compliance and American Telephone and Telegraph Company. *Id.* at 1115.

Concurrent with the litigation, the government plaintiffs and A.T.&T. on behalf of the Company conducted settlement negotiations that resulted in a Memorandum of Agreement between the parties and a Consent Decree, entered by the United States District Court for the Eastern District of Pennsylvania on January 18, 1973.[1]

Under the Consent Decree A.T.&T., including defendant, agreed to implement a model affirmative action program for the purpose of providing equal employment opportunity. The Decree contained a non-admission clause. Defendant was required to analyze eleven non-management classifications including job class 11, the job class involved in this proceeding, to determine relative distribution of minorities and women. Where under-utilization existed, the defendant was required to set a goal to increase the number of minorities, females and males. The Company was also required to establish intermediate targets for one-, two- and three-year time frames. With respect to meeting goals and timetables, the concept of an override is utilized. This applies where, in order to meet an intermediate target for an under-utilized race or

---

1. Memorandum of Agreement and Consent Decree are submitted on this motion as Exhibits H1 and H2. They were received in the arbitra-tion proceeding as Company Exhibits 11A and 11B.

sex available to fill the position, the defendant must necessarily promote one who is not the most senior or hire a member of the under-utilized race or sex. Transcript at 231, 232.

The Company was to evaluate candidates for promotion and hiring on the basis of applicable selection criteria provided in existing collective bargaining agreements. However, to the extent that defendant was unable to meet its intermediate target in job classifications 5–15 using these criteria, the Decree required that, except for job classifications 9 and 10, selections were to be made from among any basically qualified candidates for promotion and hiring in the group or groups for which the targets had not been met. The Decree states that it shall not be interpreted as requiring the abandonment of any provision of the collective bargaining agreement except as required by federal law. It specifically permits collective bargaining negotiations to reach mutually acceptable alternatives which comply with federal law. In pertinent part, the Consent Decree in Part A, Section II, at 5 provides:

The foregoing utilization analysis, goals, intermediate target and time frames shall also be developed for males in the operator and clerical classifications as part of each Bell Companies [sic] program.

The court specifically retained jurisdiction for the six-year duration of its Decree. Thereafter an Affirmative Action Plan and an Upgrade and Transfer Plan were developed by the company and approved by the federal government. Transcript at 176.

Following the entry of the Decree a meeting was held in February 1973 in which the Decree was explained and distributed to the Union. Transcript at 341. In response to a question asked by the Union during this meeting, the Company expressed a willingness to bargain. Transcript at 242, 243. Since that February meeting the plaintiff Union has not sought to bargain with the Company regarding this subject even though bargaining was expressly permitted by the terms of the Decree. Transcript at 243, 244.

After the entry of the Consent Decree, the Communications Workers Union of America [CWA] sought to intervene as a party plaintiff. The request was denied by the court except on a limited basis not related to this proceeding. On appeal, the court of appeals affirmed the lower court's dismissal of CWA as a party plaintiff but did grant CWA permission to intervene as a party defendant in order to seek modification of the Consent Decree insofar as it modifies or invalidates provisions of the CWA collective bargaining agreements. The history of the Consent Decree and the attempts by the CWA to intervene as a party plaintiff are set forth in detail in *Equal Employment Opportunity Commission v. American Telephone and Telegraph Company, supra*, 365 F.Supp. 1105, *modified*, 506 F.2d 735 (3d Cir. 1974).

Later IBEW, including plaintiff Union and the Alliance, another labor organization, was permitted to intervene on the same basis as CWA, i. e., to protect or enforce its collective bargaining agreements. While intervention proceedings were in progress, the government plaintiffs and A.T.&T. jointly filed an Interim Report of progress and problems encountered in attempting to meet the goals set pursuant to the Consent Decree. The government plaintiffs and A.T.&T. jointly moved the court to enter a Supplemental Order agreed to by both parties, which was designed to correct deficiencies in 1973 and 1974 under the Consent Decree. Intervenors requested the court to modify the Consent Decree and additionally CWA sought a preliminary injunction restraining implementation of the Consent Decree until its request to modify the Consent Decree was resolved, and IBEW moved for summary judgment. After extensive briefing and argument the court issued its decision and entered the Supplemental Order. 365 F.Supp. 1105. The court specifically approved the use of a seniority override where such was necessary to reach the goals and timetables.

CWA and IBEW unsuccessfully sought a stay in the district court pending appeal to

the court of appeals. Thereafter, by order dated October 4, 1976 the latter court denied requests by all three unions for a stay. Oral argument on the appeal was scheduled for February 14, 1977.

In January 1973 the Company conducted the work force analysis required by the Consent Decree and determined that it was under-utilized in males in clerical positions. The position of "Operations Clerk" is in job class 11. Its title is clerical and has traditionally been filled by females. Transcript at 181–83. Pursuant to the Decree, at 5, this job was one for which goals were required to be set for males. This required approval was obtained for the targets established in the instant proceeding. Transcript at 185, 186. In October 1973 the defendant had one opening to be filled for the remainder of the year. As the defendant had not met its intermediate target for 1973 (no males had sought the available opening), the Company filled this last opening for the year, as mentioned above, by hiring a male. Transcript at 197, 198. The Company did not compare his qualifications with those of plaintiff Biel. *Id.*

The Union grieved the denial of the promotion of Biel. The Company's reply was that the Consent Decree of January 18, 1973, entered into by A.T.&T. and the EEOC, was binding on it and required it to fill the job of Operations Clerk with a white male.

The grievance procedure failed to resolve the grievance. Accordingly, it was taken to arbitration in accordance with the collective bargaining agreement. Hearings were held in February and March of 1975 in which all parties participated, introduced evidence, and examined and cross-examined witnesses. *See generally* Transcript of Record, Defendant's Brief, Exhibit B.

On June 15, 1976 a majority of the Board of Arbitration issued the Opinion and Award of the Board. Complaint, Exhibit B. The award provided:

The Grievance is sustained. The Company is directed to promote Bertha Biel to the job of Operations Clerk together with the difference in wages between Opera-tions Clerk and Records Clerk from October 29, 1973 to the date of compliance with this Award.

The Board issued the above award after making the following findings.

Having examined the evidence, including the testimony of General Personnel Supervisor White, I find that the Company acted "arbitrarily" when it disregarded the contractual standards set forth in Article XV, Section 1; when it applied the standard of color and sex (white male); when it applied a standard that was inconsistent with the language set forth in Article XVII; in the denial of the promotion application of the grievant Bertha Biel.

Opinion, at 11.

On July 8 and 14, 1976 the Company notified the Union of its refusal to comply with the award.

The Company now seeks to have the award of the Arbitration Board vacated on the grounds that (1) the Board exceeded its authority by considering matters outside the scope of the collective bargaining agreement, that is, the Trial Hiring Plan, in concluding that defendant violated Article XV of the Agreement; (2) the award conflicts with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Consent Decree and the affirmative action programs required by federal legislation and executive orders; and (3) the Company is immunized against the effect of the award under section 713(b) of the Civil Rights Act because it relied on the Consent Decree and letters from the EEOC to override Biel's seniority and to fill the job with a white male.

Plaintiff union seeks enforcement of the arbitration award. It argues that: (1) the Board as required by law and by the collective bargaining agreement, limited its jurisdiction to and drew the essence of its award from provisions of the collective bargaining agreement and not from the Consent Decree; (2) the Consent Decree does not apply to the circumstances of this case; (3) a Title VII override of seniority and qualifications

of incumbent employees is not available to individuals who have not been the victims of employment discrimination by the employer; and (4) the law does not immunize the Company from the effect of the award resulting from an arbitration voluntarily entered into by the Company and Union pursuant to their agreement, when to grant such immunity would penalize an innocent employee injured by the contract violation of her employer.

The issues before the court are these: (1) whether the arbitration board exceeded its authority; (2) whether the Consent Decree applies to this case; (3) if so, because the Consent Decree and arbitration award are conflicting, which takes precedence over the other.

■ It is well settled that the merits of an arbitral award are not subject to plenary review by a court. *See United Steel Workers v. Enterprise Wheel and Car Corporation*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1968); *Amalgamated Butcher Workmen v. Capitol Packing Co.*, 413 F.2d 668 (10th Cir. 1969); *Ludwig Honold Manufacturing v. Fletcher*, 405 F.2d 1123 (3d Cir. 1969); *and see United Mine Workers of America v. Barnes & Tucker Co.*, 561 F.2d 1093, 1096–1097 (3d Cir. 1977).

■ There is a presumption in favor of the award's validity. *See Kroger Co. v. Teamsters, Local 661*, 380 F.2d 728 (6th Cir. 1967); *Shahmoon Industries v. United Steelworkers*, 263 F.Supp. 10 (D.N.J.1966).

■ While a court may not review the merits of the award, it may examine the grounds upon which the arbitrator rested his or her decision in order to ensure that those grounds were appropriate.

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement . . .. He may of course look for guidance from many sources, yet his award is legitimate only so far as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*United Steel Workers v. Enterprise Wheel and Car Corp., supra*, 363 U.S. at 597, 80 S.Ct. at 1361.

■ At the same time that a court may only enforce an arbitration award to the extent that the award "draws its essence from the collective bargaining agreement," it would seem clear that the court should also decline to enforce an award insofar as it may conflict with statutory law or public policy. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Associated Milk Dealers, Inc. v. Milk Drivers Union*, 422 F.2d 546 (7th Cir. 1970); *Local 453, International Union of Elec. Radio & Mach. Workers v. Otis Elevator Co.*, 314 F.2d 25 (2d Cir. 1963), *cert. denied*, 373 U.S. 949, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963); *Savannah Printing Specialties and Paper Products Local Union 604 v. Union Camp Corp.*, 350 F.Supp. 632 (S.D. Ga.1972).

■ The Arbitration Board, in its opinion, set forth an explanation of its role and authority as an arbitrator in a case involving alleged conflicts between the collective bargaining agreement and the Consent Decree entered into by the Company and the EEOC. Arbitrator Moskowitz concurred in the view expressed by other arbitrators in similar cases:

> that whenever a situation is presented . . . and primary jurisdiction to adjudicate the question of law resides with the courts, the arbitrator should refrain from and make it clear that he is not deciding the issue of law but only the narrower question of contract interpretation.

Award, Exhibit C at 14. Citing *Alexander v. Gardner-Denver, supra*, he concurred in the determination that " 'the entire question of the breach of the decree and the extent to which the Company's action was permissalbe [sic] or required by decree is one which . . . is inappropriate for determination in this arbitration proceeding.' "

In *Alexander v. Gardner-Denver, supra,* a discharged employee filed a grievance against his former employer under the collective bargaining agreement between his union and former employer. The employee's grievance was not sustained in the resulting arbitration. Thereafter, the EEOC ruled that there was not sufficient cause to believe that a violation of Title VII had occurred. The employee subsequently brought his case to the United States District Court under Title VII. The district court granted defendant's motion for summary judgment, holding that the plaintiff was bound by the arbitral decision and could not raise the same claim in court under Title VII as he had raised before the arbitrator under the collective bargaining agreement. The court of appeals affirmed. The Supreme Court, however, ruled that Title VII is within the exclusive province of the courts, irrespective of whether the same claim has gone to arbitration under a parallel non-discrimination provision of a collective bargaining agreement. In part, then, the Court held that an arbitrator is limited to a determination of contractual rights and has no authority to determine or affect statutory rights.

While *Gardner-Denver* involved an individual employee's Title VII claim against a company employer, the analogy to this case is still a strong one. Here it is the company which is asserting that its responsibilities under Title VII are contrary to certain provisions of an arbitration award. Thus, while the situation here is the converse of that in *Gardner-Denver,* the applicable rule is the same: the rights and duties which exist under Title VII are to be determined by the court. No binding decision in this regard was, or could have been, made by the arbitrator.

It is the view of the court, therefore, that the arbitrator's province is limited to the contract between the parties and so much of his decision as rests solely upon considerations extrinsic to the contract is subject to plenary review by the court.

The arbitrator, I find, properly refrained from deciding the merits of the application of the Consent Decree.

Defendant asserts that the arbitrator should also have refrained from utilizing the Trial Hiring Plan in his decision and that because it was relied upon, the award must be vacated.

In his opinion, the arbitrator found that defendant acted arbitrarily when it denied promotion to plaintiff Biel. Defendant on that issue argued that in the absence of a contractual restriction, it is free to hire rather than to promote and it chose to hire. The Union's position was that while the employer may have the reserved right to hire, it may not fill jobs for which bargaining unit personnel have made application and are qualified. In response to their arguments, Arbitrator Moskowitz stated:

> I find it unnecessary to reach a conclusion stated as broadly as either the Union or Employer have done here.

> According to the proof, the Company admitted that the Union had some justification for concern when new hires were "jump hired" directly in higher paid titles, and that it took great pains to avoid such practice. *In fact, the "Trial Hiring Plan" of July, 1959 (Company Exhibit No. 2) provides that vacancies in higher-graded titles "will be filled by upgrading or by hiring in accordance with" considerations or standards identical with those set forth in Article XV, Section 1.*

> Having examined the evidence, including the testimony of General Personnel Supervisor White, I find that the Company acted "arbitrarily" when it disregarded the contractual standards set forth in Article XV, Section 1; when it applied the standard of color and sex (white male); when it applied a standard that was inconsistent with the language set forth in Article XVII; in the denial of the promotion application of the grievant Bertha Biel.

Opinion at 11 (emphasis added).

It is clear that the arbitrator based his award on the violations of the provisions of the collective bargaining agreement and that his mention of the Trial Hiring Plan

was only as an indication of the earlier procedures used by the Company in hiring. It should be noted that the Plan was introduced by the Company and used by its witnesses. *See* Testimony of White, Transcript at 112–13. The arbitrator in that part of his opinion quoted above simply recapitulated a portion of the testimony presented to him and arrived at his decision on the basis of the testimony and his understanding of the agreement. I find the award properly drew its essence from the agreement, and that the Company's contention with respect to the Trial Hiring Plan is without merit.

■ The Company asserts that the Consent Decree is applicable and takes precedence over any conflicting arbitration award, that it was ordered to take affirmative action pursuant to federal law, and therefore an arbitration award which mandates action inconsistent with that order is unenforceable. It further argues that it is immune from liability pursuant to section 713(b) of the Civil Rights Act.

Plaintiffs assert that the Consent Decree should not be applied to overturn the arbitration award. They argue that the Company is not immunized against the effect of the award by section 713(b) of Title VII and that if the arbitrator exercised his contractual authority to issue an award, that authority remains even if the contractual right sustained happens to be similar to a Title VII right.

It is undisputed that the Company's motive for hiring a white male, rather than plaintiff Biel, was to fulfill its quota obligations under the Decree. As mentioned above, the Company asserts that the job of operations clerk was one for which goals were required to be set for males. Because it had not met its intermediate target for 1973, the Company filled this last opening for the year by hiring a male. It is clear, therefore, that the Decree is applicable to this case.

The Consent Decree was arrived at after much negotiation between the parties. Plaintiff IBEW participated and was a party to those negotiations. The settlement was approved by the court, even over objections of class members who thought additional relief should have been granted. *See Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799 (3d Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974); *Ace Heating & Plumbing Co. v. Crane Co.,* 453 F.2d 30 (3d Cir. 1971). I treat the Decree, as did the Third Circuit in *Equal Employment Opportunity Commission v. American Telephone and Telegraph Co. (E.E.O.C. v. A.T.T.),* 556 F.2d 167 (3d Cir. 1977), as "that of a fully litigated decree." 556 F.2d at 174. As such, absent a showing of exceptional circumstances, the overriding interest of the courts in "the finality and repose of judgments" cannot be overcome. *Mayberry v. Maroney,* 558 F.2d 1159 at 1164 (3d Cir., 1977).

The court of appeals in *E.E.O.C. v. A.T.T., supra,* appropriately stated the requirements of the Decree:

> When any Bell Company is unable to achieve or maintain its intermediate target, applying normal selection standards, it is required by the decree to depart from those standards in selecting candidates for promotional activities. It must then pass over candidates with greater seniority or better qualifications in favor of members of the underrepresented group who are at least "basically qualified."

556 F.2d at 171.

> The supplemental order, . . . articulates the understanding of the parties that while the original Consent Decree was not intended to supplant the collective bargaining agreements, *to the extent that any provisions of the latter would prevent the achievement of the affirmative action targets and goals, the decree controlled.*

*Id.* at 172 (emphasis added).

■ Plaintiffs assert that even if the Consent Decree prevails, the affirmative action override should not have been applied to deny plaintiff Biel a promotion to operations clerk. Biel, the argument goes, was a member of the protected class, Everett had

not been a victim of prior discrimination and the job of operations clerk was not historically a female-segregated job barred to white males.

In reply to these arguments, close attention must be given to the Consent Decree itself and its interpretations by the courts. It is clear that the purpose of the action brought against the Company and the Decree itself was to correct the imbalance and promote "full utilization of all race, sex, and ethnic groups in each of fifteen job classifications." *Id.* at 171. It is not necessary, therefore, that Everett himself be a victim of prior discrimination. And plaintiffs' argument that Biel was a member of the protected class likewise falls by the wayside. Depending on the imbalance, any combination or class of people would be the protected class in one job classification at a particular company.

Finally, the fact that the position of operations clerk was not "historically" a female-segregated job is irrelevant. For purposes of this action, it matters only that that classification was underequipped with white males at the time the settlement was entered into and the Decree signed. Any attack on the inclusion of the job of operations clerk in the Decree should be addressed to the court which signed the Decree and which maintains continuing jurisdiction over it and its implementation.

Plaintiffs point out that the broad authority of the federal courts, under 42 U.S.C. § 2000e–5(g), to order appropriate affirmative action is to be guided by the "make whole" objective as the Supreme Court explained in *Franks v. Bowman Transportation Co., Inc.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). This means that affirmative action should be available only to identifiable victims of specific discrimination. Individual victims of employment discrimination are "made whole" by affirmative action. "Thereafter, the seniority system would operate to benefit them as if they had not previously been discriminated against and would operate to benefit incumbent employees in accordance with the adjusted seniority roster." Plaintiff's Brief at 32–33.

In *Franks v. Bowman Transportation Co., supra*, the Supreme Court, in a class action Title VII suit against the employer for racially discriminatory employment practices, found, under the "make whole" doctrine, that an eligible and presently qualified candidate who was a victim of prior discrimination could, and indeed should, under certain circumstances be given a promotion to the position sought, even at the expense of other, innocent employees. Specifically, it stated:

> [T]he burden of the past discrimination in hiring is with respect to competitive status benefits divided among discriminatee and nondiscriminatee employees under the form of relief sought. The dissent criticizes the Court's result as not sufficiently cognizant that it will "directly implicate the rights and expectations of perfectly innocent employees." *Post*, at 788. We are of the view, however, that the result which we reach today—which, standing alone, establishes that a sharing of the burden of the past discrimination is presumptively necessary—is entirely consistent with any fair characterization of equity jurisdiction, particularly when considered in light of our traditional view that "[a]ttainment of a great national policy . . . must not be confined within narrow canons for equitable relief deemed suitable by chancellors in ordinary private controversies." *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177 at 188, 61 S.Ct. 845, 85 L.Ed. 1271.

> Certainly there is no argument that the award of retroactive seniority to the victims of hiring discrimination in any way deprives other employees of indefeasibly vested rights conferred by the employment contract. This Court has long held that employee expectations arising from a seniority system agreement may be modified by statutes furthering a strong public policy interest.

*Id.* at 777–78, 96 S.Ct. at 1270–71 (footnote omitted).

The Third Circuit discussed this issue in *E.E.O.C. v. A.T.T., supra.* Relying on pre-

vious Third Circuit cases as well as cases in other circuits, the court concluded that class relief is appropriate without regard to the victim status of every class member where the class has been discriminated against with respect to hiring or promotions. 556 F.2d at 177, and note 5; *see also Mele v. United States Department of Justice*, 395 F.Supp. 592, 595 (D.N.J.1975).

As the backdrop for its conclusion, it cited *United States v. Ironworkers Local 86*, 443 F.2d 544 (9th Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971), which was discussed and utilized by Congress when it was debating the amendments to Title VII in 1972. *See* Subcomm. on Labor of the Senate Committee on Labor and Public Welfare, Legislative History of the Equal Employment Opportunity Act of 1972 at 1017, 1042–74, 1681, 1714–17. There the court stressed the broad remedial power with which federal courts are vested when a pattern or practice of discriminatory conduct is discovered. 443 F.2d at 553. It upheld the use of racial quotas and preferences as necessary for a district court "to effectuate the desire of Congress to eliminate all forms of discrimination." *Id.*

In *United States v. International Union of Elevator Constructors*, 538 F.2d 1012 (3d Cir. 1976), the court established, with citations to the many cases in the various circuits, that the courts are firm in the view that quota remedies are permissible. *Id.* at 1020.

On the basis of the findings by these courts as well as the many others, cited by it in note 5, the court in *E.E.O.C. v. A.T.T.*, *supra*, felt that it was

> reinforced in [its] conclusion that class relief, without regard to the victim status of every class member, is appropriate by the firm consensus in the courts of appeals upon the lawfulness of class-based hiring preferences and membership goals.

556 F.2d at 177 (footnote omitted).

The argument that affirmative action should be available only to identifiable victims of discrimination is therefore rejected. The fact that Everett, who was hired over plaintiff Biel, was not an identifiable victim

should not prevent the entire affirmative action plan formed in the Consent Decree from being given effect.

■ Plaintiffs next assert that the Company has no standing to urge vacating the award on Title VII considerations. Relying on language in *Alexander v. Gardner-Denver, supra*, they argue that the arbitration decision is binding and that the Company cannot now act, after participating in the arbitration, to vacate it under Title VII.

In *Gardner-Denver* the district court, with the court of appeals affirming, granted the employer's motion for summary judgment, finding that plaintiff was bound by a prior arbitral decision and had no right to sue under Title VII. The Supreme Court reversed stating:

> This argument mistakes the effect of Title VII. Under the *Steelworkers trilogy*, an arbitral decision is final and binding on the employer and employee, and judicial review is limited as to both. But in instituting an action under Title VII, the employee is not seeking review of the arbitrator's decision. Rather, he is asserting a statutory right independent of the arbitration process. *An employer does not have "two strings to his bow" with respect to an arbitral decision for the simple reason that Title VII does not provide employers with a cause of action against employees. An employer cannot be the victim of discriminatory employment practices.*

415 U.S. at 54, 94 S.Ct. at 1022–23 (emphasis added). Plaintiffs' argument here is that the Company in seeking to vacate the award is trying to get a "second string to its bow." The Court in its consideration of the arbitration award versus Title VII makes clear, however, that arbitration procedures "while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII." *Id.* at 56, 94 S.Ct. at 1024. Congress, it stated, intended that the federal courts exercise final responsibility for Title VII. *Id.* This conclusion was based on the spe-

cial role of the arbitrator whose responsibility is to effectuate the intent of the parties and not the requirements of enacted legislation.

Plaintiffs are arguing that no Title VII considerations exist and that this controversy concerns only a collective bargaining agreement; therefore, the arbitrator's decision should stand. That is not the case. Whether plaintiffs here are responsible, or whether another group of plaintiffs in another action brought before this cause of action arose, is accountable, Title VII is certainly an element in the claim before this court. The Company was sued for Title VII violations; and a Consent Decree was entered into. The Company, in attempting to comply with the Decree and avoid further allegations and accusations of violations of Title VII, came into conflict with its collective bargaining agreements with plaintiffs. This conflict, as has been mentioned, was foreseen by the parties and the court in the former action. The Third Circuit has affirmed the fact that the Consent Decree, while not intended to supplant collective bargaining agreements, would control where provisions of the agreements would prevent achievement of the affirmative action targets and goals. *E.E.O.C. v. A.T.T., supra*, 556 F.2d at 172.

The language in *Gardner-Denver* is inapplicable to the case at bar where compliance with Title VII standards are at issue.

The plaintiffs have directed the court's attention to *Communication Workers of America v. Mountain States Telephone and Telegraph Co.*, Civil No. 75–F–245 (D.Colo. January 14, 1977) (unpublished) in which the court was faced with the problem of whether to enforce an arbitration award. As in the case at bar, the Company in *Mountain States* exercised its affirmative action override under the Consent Decree. Plaintiffs argued that the override was being illegally utilized by the Company and was violating the seniority provisions of the collective bargaining agreements. The parties went to arbitration. The arbitrator who considered Title VII in his evaluation found on this issue that the procedure used

by the Company to override was inadequate and that the CWA was entitled to the relief it sought. The district court found that the award was procedurally proper and validly rendered but undertook to consider *de novo* a substantive interpretation of Title VII and its application to the case. Opinion at 9. The award of the arbitrator recognized that the Company was authorized under the Consent Decree to set aside the criteria in the collective bargaining agreements if it found it was unable to meet its intermediate targets. But the arbitrator found "implicit" in the Decree "a requirement that the Company make a careful, good faith determination that application of the affirmative action override is a matter of real necessity, and that it be able to document this finding." *Id.* at 12. He went on to find that the Company had not demonstrated this good faith determination.

The district court agreed:

The requirement that the Company demonstrate good faith in the utilization of the affirmative action override, an admittedly extraordinary remedy, is not unduly burdensome. Because the override is inevitably disruptive of the seniority system agreed upon by the Union and the Company, the arbitrator found that its implementation should be preceded by a showing of its necessity. We are not convinced that this added procedural requisite will significantly impede the process of the override.

*Id.* The court found the arbitration award valid, legal and binding on the parties. *Id.* at 13.

I find that *Mountain States* is distinguishable from the case at bar. Here the arbitrator properly (as I have so pointed out above) did not consider Title VII or the Consent Decree in his findings. His decision cannot be enforced in a vacuum, however. The Consent Decree, which provides the motive for the Company's action, must be taken into consideration by the court. There is also no showing here that the Company did not act in good faith in applying the override. There is a lengthy examination as to the reasons for the Company's

use of the override. *See* Defendant's Brief, Exhibit B, Transcript at 186–200.

Finally, the recent Supreme Court decision in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)[2] merits some discussion. In that case the United States brought an action against T.I.M.E.–D.C. and the IBT charging discriminatory hiring, assignment and promotion policies against blacks and Spanish-surnamed persons. The complaint also challenged the seniority system established by the collective bargaining agreements between employer and union. The government sought a general injunctive remedy and specific "make whole" relief for all individual discriminatees. *Id.* at 328, 97 S.Ct. 1843. The district court found that the company engaged in a plan of discrimination in violation of Title VII and further found that the collective bargaining agreements also violated Title VII. The court of appeals agreed with the basic conclusions of the lower court and supplemented the relief afforded by the district court. The company and union appealed. On the issue of the validity of the seniority the union argued that the seniority system is "bona fide" within the meaning of § 703(h) of Title VII, 42 U.S.C. § 2000e–2(h), while the government contended that a seniority system which perpetuates the effects of prior discrimination, whether pre- or post-Act, can never be "bona fide" under § 703(h). *Id.* at 343, 97 S.Ct. 1843. The Court, rejecting the government's position as to pre-Act discrimination, held that

> an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination. Congress did not intend to make it illegal for employees with vested seniority rights to continue to exercise those rights, even at the expense of pre-Act discriminatees.

*Id.* at 353, 97 S.Ct. at 1864. The Court found the seniority system "entirely bona fide" in that it applied equally to all races and ethnic groups. *Id.*

While significant in its discussion of seniority rights, the holding in *IBT* is not directly applicable to the case before me. The key distinguishing factor in this case is the existence of an outstanding Consent Decree and Supplemental Order, both signed by the court, which as mentioned above have the weight of a fully litigated decree. The requirement to override as provided in the Decree results from judicial imposition of a remedy pursuant to § 706(g) of Title VII. *IBT* is distinguishable in that it is concerned with individual remedies and whether a bona fide seniority system which perpetuates past discrimination is violative of § 703(h).

Plaintiff IBEW was a party to the Supplemental Order. *See E.E.O.C. v. A.T.T.*, 419 F.Supp. 1022, 1031 (E.D.Pa. 1976), *aff'd*, 556 F.2d 167 (3d Cir. 1977). IBEW here was permitted a full opportunity to convince the court that the relief A.T.&T. had agreed to went beyond that required to remedy the problem. 556 F.2d at 172. All decisions made after the Union's intervention are binding in this action and plaintiff Union as well as plaintiff Biel, whose interests were represented by the union at the time, are collaterally estopped from challenging its validity and application. *See generally* 1B Moore's Federal Practice ¶ 0.411[2]; *Scooper Dooper, Inc. v. Kraftco*, 494 F.2d 840, 845 (3d Cir. 1974); *Oburn v. Shapp*, 70 F.R.D. 549, 552–53 (E.D. Pa.), *aff'd*, 546 F.2d 418 (3d Cir. 1976).

While non-parties who did not participate in a consent decree and are affected by it may later challenge it on the ground that it violates federal law (*see Columbia Broadcasting System, Inc. v. American Society of Composers, Authors and Publishers*, 562 F.2d 130 at 139 (2d Cir. 1977)), it has been expressly determined that plaintiffs' interests here were adequately represented and that the Union participated in the negotiations leading to the Consent Decree. *E.E. O.C. v. A.T.T., supra ; see also Communications Workers of America v. Mountain States Telephone and Telegraph Co., supra,* opinion at 10. Plaintiffs are therefore es-

---

**2.** Referred to hereafter as *IBT*.

topped from relitigating the question. *See McAleer v. American Telephone and Telegraph Co.*, 416 F.Supp. 435, 438 (D.D.C. 1976). This court specifically rejects the conclusion reached by the court in *McAleer, supra,* that plaintiff, who as here was allegedly discriminated against by the Company in order to comply with the Consent Decree, while not entitled to a promotion, was entitled to an award of damages. *Id.* at 439–40. The rationale for this decision was that, because the judicial decree was necessitated by the wrongful conduct of the employer, it should not be protected from the claims of a faultless employee. *Id.* at 440. This court finds that the interests of plaintiff Biel were represented by the IBEW who participated in the negotiations for the Consent Decree and later in the action itself. If every damages claim by a "faultless employee," *id.,* is sustained, when the Company attempts to comply with the Consent Decree, the Company is placed in the position of being "damned if it does, damned if it doesn't."

One concluding remark need be made with respect to the plaintiffs' attack on the affirmative action override. Plaintiff Union intervened in the EEOC action against A.T.&T. for violations of Title VII. It subsequently moved to modify the Decree in *E.E.O.C. v. A.T.T., supra,* 419 F.Supp. 1022. All of its objections were carefully considered by the district court as well as the Third Circuit on appeal. It specifically proposed that the court allow an arbitrator to review each use of the override which proposal was rejected by the court. *Id.* at 1059.

Plaintiff Union now seeks to do by arbitration award what it could not do by direct attack on the Consent Decree. It is. the position of this court that if an attack be made on the affirmative action override, where it is utilized to comply with the requirements of the Consent Decree or Supplemental Order, it should be made before the District Court in the Eastern District of Pennsylvania which retains continuing jurisdiction of the matter until January 18, 1979. *See Black and White Children of Pontiac School System v. School District of Pontiac,* 464 F.2d 1030 (6th Cir. 1973); *Oburn v. Shapp,* 393 F.Supp. 561, 576 (E.D. Pa.), *aff'd,* 521 F.2d 142 (3d Cir. 1975).

For the foregoing reasons, the arbitration award in this action is vacated. The motion of plaintiffs for summary judgment is denied. The motions of defendant New Jersey Bell Telephone Company as well as defendant-intervenors EEOC, Marshall and the United States of America are granted to the extent outlined in this opinion.